**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

UNION LINE FARMS, INC., on behalf of
itself and all others similarly situated,

                              Plaintiff,

v.

THE MOSAIC COMPANY;
NUTRIEN LTD.;
NUTRIEN AG SOLUTIONS, INC.;
CF INDUSTRIES HOLDINGS, INC.;
CF INDUSTRIES, INC.;
CF INDUSTRIES NITROGEN, LLC;
KOCH AGRONOMIC SERVICES, LLC;
YARA INTERNATIONAL ASA;
YARA NORTH AMERICA, INC.; and
CANPOTEX LTD,

                              Defendants.

---

**CLASS ACTION COMPLAINT**

---

Plaintiff, Union Line Farms, Inc. ("Plaintiff"), on behalf of itself and all others similarly situated, upon personal knowledge as to the facts pertaining to it and upon information and belief as to all other matters, and based on the investigation of counsel, brings this class action complaint against the above-captioned defendants The Mosaic Company ("Mosaic"); Nutrien Ltd. and Nutrien Ag Solutions, Inc. (together, "Nutrien"); CF Industries Holdings, Inc., CF Industries, Inc., and CF Industries Nitrogen, LLC (together, "CF Industries"); Koch Agronomic Services, LLC ("Koch"); Yara International ASA and Yara North America, Inc. (together, "Yara"); and Canpotex Ltd. ("Canpotex") (defendants referred to together as the "Defendants") for violations of federal antitrust and common law.

## I.    NATURE OF THE ACTION

1.    This action arises from Defendants' conspiracies to fix, raise, maintain, and/or stabilize prices for nitrogen fertilizers (the producers are CF Industries, Nutrien, Koch, and Yara, together "Nitrogen Defendants"), phosphorus fertilizers (the producers are Nutrien and Mosaic, together "Phosphorus Defendants"), and potassium (potash) fertilizers (the producers are Nutrien and Mosaic, and together with Canpotex, the "Potash Defendants")—collectively referred to as "NPK Fertilizers"—from at least as early as January 1, 2021, until Defendants' unlawful conduct and its anticompetitive effects cease to persist ("Class Period"). Defendants are the largest producers of NPK Fertilizers in the United States.

2.    Nitrogen fertilizers ("Nitrogen Fertilizers") are fertilizers which contain nitrogen as the chief component in their final product. There are a number of different

forms of Nitrogen Fertilizers, including nitrate fertilizers, ammonium fertilizers, ammonium nitrate fertilizers, and urea. The forms are based on the form of nitrogen present in the Nitrogen Fertilizer.

3.     Phosphorus fertilizers ("Phosphorus Fertilizers") are produced from mined phosphate rocks. Phosphate rock is dissolved with acid before it can act as an active ingredient in fertilizers.

4.     Potash is a potassium-based fertilizer ("Potash") typically sold in the form of potassium chloride ("KCl"). Potash is mined from underground deposits.

5.     Beginning in or around 2021, NPK Fertilizer prices departed from historical norms and began increasing at unprecedented rates. NPK Fertilizer prices spiked dramatically throughout 2021 and 2022 and remained elevated well after the supply shocks Defendants claimed were responsible subsided. These inflated prices are a result of Defendants' conspiracies, as described below.

6.     During the 2021-2022 spike, the prices U.S. farmers, like Plaintiff and members of the Class, paid for NPK Fertilizers increased by over 60%. ***These increases added an estimated $128,000 in costs per farm in 2022***.

7.     On March 4, 2026, *Bloomberg Law* reported that the United States Department of Justice, Antitrust Division ("DOJ"), was investigating whether producers of NPK Fertilizers colluded to raise prices in violation of civil or criminal antitrust laws. *Bloomberg Law* indicated that Mosaic, Nutrien, CF Industries, Koch, and Yara were under investigation and that the investigation involved Nitrogen Fertilizers, Phosphorus Fertilizers, and Potash.

8.      Defendants' conspiracies have been to the detriment of Plaintiff and members of the Class (defined below) and have caused them to pay supracompetitive prices for NPK Fertilizers during the Class Period. Plaintiff brings this class action Complaint against Defendants for violations of Section 1 of the Sherman Antitrust Act and violations of common law.

## II.    JURISDICTION AND VENUE

9.      **Subject Matter Jurisdiction.** This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337(a), and pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

10.     **Personal Jurisdiction**. This Court has personal jurisdiction over Defendants because they transact business or may otherwise be found in this District.

11.     **Venue.** Venue in this District is proper as Defendants transact business or have registered agents in this District. Venue is also proper in this District because Defendants' conduct, as alleged herein, caused harm to Class members in this District. Additionally, Defendant Nutrien Ag Solutions is headquartered in this District.

12.     **Interstate Commerce**. Defendants' conduct as alleged herein substantially affects interstate trade and commerce by harming competition, raising prices, restricting output, and harming Class members throughout the United States.

## III.    PARTIES

### 1.  Plaintiff

13.     Plaintiff Union Line Farms, Inc. is an Iowa corporation with its principal place of business in Hopkinton, Iowa. Plaintiff purchased one or more NPK Fertilizers

from one or more of the Defendants during the Class Period. By paying artificially inflated prices for NPK Fertilizers, Plaintiff suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

### 2.  Mosaic

14.     The Mosaic Company is a publicly traded company incorporated in Delaware with its principal place of business in Tampa, Florida. The Mosaic Company was formed in October 2004 by a merger between IMC Global and Cargill's crop nutrition division, immediately creating one of the world's largest producers of fertilizers. In 2016, Mosaic acquired Vale S.A.'s Vale Fertilizantes business, giving it access to two additional Potash plants in Brazil and Saskatchewan. Mosaic is currently one of largest North American producers of Potash and Phosphorus Fertilizers.

15.     During the Class Period, Mosaic sold Phosphate Fertilizers and Potash to purchasers in the United States, including members of the Class.

### 3.  Nutrien

16.     Nutrien Ltd. is a publicly traded Canadian company with its principal place of business in Saskatoon, Saskatchewan. Nutrien arose out of PotashCorp, which was first established as a public corporation by the government of Saskatchewan in 1975. Following its 1990 privatization, the company pursued an aggressive expansion strategy, snapping up major U.S. producers of fertilizers such as Potash Company of America, TexasGulf, and White Springs Agricultural Chemicals. In 2016, PotashCorp proposed a merger with Agrium, a supplier of agricultural products and a major producer of Potash. In 2018, the FTC approved the merger contingent on the divestiture

of two Agrium facilities, neither of which produced Potash. The combined company would become the world's largest Potash producer, operating six of Saskatchewan's ten Potash mines, and becoming the second largest fertilizer company worldwide. As of the date of consolidation, the merged firm held approximately 60% of Potash capacity in North America.

17.     Nutrien Ag Solutions, Inc. is a wholly-owned subsidiary of Nutrien Ltd. that is incorporated in Delaware with its principal place of business in Loveland, Colorado.

18.     During the Class Period, Nutrien sold Nitrogen Fertilizers, Phosphorus Fertilizers, and Potash to purchasers in the United States, including members of the Class.

### 4.  CF Industries

19.     CF Industries Holdings, Inc. is a publicly traded company incorporated in Delaware with its principal place of business in Northbrook, Illinois. CF Industries is the world's largest producer of ammonia, a key input in Nitrogen Fertilizers.

20.     CF Industries Inc. is a wholly-owned subsidiary of CF Industries Holdings, Inc. that is incorporated in Delaware with its principal place of business in Northbrook, Illinois. CF Industries Inc. is the primary operating subsidiary of CF Industries Holdings.

21.     CF Industries owns approximately 89% of CF Industries Nitrogen, LLC; agricultural cooperative, CHS Inc., owns the remainder. CF Industries Nitrogen, LLC is incorporated in Delaware with its principal place of business in Northbrook, Illinois.

22.     During the Class Period, CF Industries sold Nitrogen Fertilizers to purchasers in the United States, including members of the Class.

### 5.  Koch

23.     Koch Agronomic Services, LLC is incorporated in Delaware with its principal place of business in Wichita, Kansas. Koch is one of the world's largest producers of Nitrogen Fertilizers.

24.     During the Class Period, Koch sold Nitrogen Fertilizers to purchasers in the United States, including members of the Class.

### 6.  Yara

25.     Yara International ASA is a publicly traded Norwegian company with its principal place of business in Oslo, Norway. Yara is one of the world's largest producers of Nitrogen Fertilizers.

26.     Yara North America, Inc. is a wholly-owned subsidiary of Yara International ASA that is incorporated in Delaware with its principal place of business in Tampa, Florida.

27.     During the Class Period, Yara sold Nitrogen Fertilizers to purchasers in the United States, including members of the Class.

### 7.  Canpotex

28.     Canpotex Limited is a Canadian joint venture that is wholly owned by Mosaic and Nutrien. Canpotex is headquartered in Saskatoon, Canada.

29.     Canpotex manages and operates a fleet of customized railcars, port terminal facilities, ocean vessels, and more, serving Mosaic and Nutrien in transporting Potash.

**8.  Unnamed Co-conspirators and Other Non-Parties**

30.    Various other persons, firms, and corporations not named as Defendants have participated as co-conspirators with Defendants and have performed acts in furtherance of the illegal conduct described herein. Defendants are jointly and severally liable for the acts of these unnamed co-conspirators.

31.    Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

32.    Defendants are also liable for acts done in furtherance of the alleged conduct by companies they acquired through mergers and acquisitions.

## IV.   FACTUAL ALLEGATIONS

### A.  NPK Fertilizer Market in North America

33.    Fertilizer is a critical component for a successful agricultural business. It helps plants grow and keeps soil healthy. The most important nutrients that nearly all crops need are nitrogen (N), phosphorus (P), and potassium (K), commonly referred to together as "NPK". Typically, a fertilizer will focus on delivering one or all of these core nutrients.

34.    Phosphorus Fertilizers and Potash are produced from mined ores. To produce Nitrogen Fertilizers, air and natural gas are combined to create ammonia through the Haber-Bosch process.

**Figure 1. NPK Fertilizer Production.[1]**



35.     As recently as 1990, there were dozens of NPK Fertilizer producers in North America. By 2024, there were less than five significant producers in each NPK Fertilizer market. Indeed, just three companies—Nutrien, Mosaic, and CF Industries—control most of the domestic NPK Fertilizer market.

36.     Defendants CF Industries, Nutrien, Koch, and Yara control approximately 80% of the Nitrogen Fertilizer market in the United States.

37.     The Potash and Phosphorus Fertilizer markets are even more concentrated, as Defendants Nutrien and Mosaic control 90% of the Phosphorus Fertilizer and Potash markets in the United States.

---

[1] "How Fertilizers are Made," *Fertilizers* Europe, *available at* https://www.fertilizerseurope.com/fertilizers-in-europe/how-fertilizers-are-made/

**Figure 2. Number of NPK Fertilizer Companies in North America (1990/2024)[2]**



### 1. Nitrogen Fertilizer Production

38.    Nitrogen Fertilizers are produced through the Haber-Bosch process. That process consists of a reaction between nitrogen and hydrogen under intense heat and pressure, combined with a catalyst, which produces ammonia. The Haber-Bosch process is a complex, energy-intensive method of producing ammonia. There are currently no viable alternative methods.

---

[2] "Fertilizer: The Hidden Engine of Corporate Power," *Farm* Action (October 9, 2025), *available* at https://farmaction.us/fertilizer-the-hidden-engine-of-corporate-power/

**Figure 3. The Haber-Bosch Process.**[3]



39.    Ammonia is the foundational input for nearly all Nitrogen Fertilizers.

40.    Ammonia is used directly in the form of anhydrous ammonia. Anhydrous (contains no water) ammonia is a colorless, pressurized liquid that immediately turns into gas when injected into the soil. Anhydrous ammonia is 82% nitrogen.

---

[3] Luis Jimenez, "Haber-Bosch Process," *Stanford University* (Dec. 14, 2022), *available at* http://large.stanford.edu/courses/2022/ph240/jimenez2/images/f1big.png

**Figure 4.  Anhydrous Ammonia Application.[4]**



41.     Another common form of Nitrogen Fertilizer is urea. Urea is produced by combining ammonia and carbon dioxide to form ammonium carbamate, which is then converted into urea through dehydration. Urea is converted into solid white crystalline fertilizer pellets that can be stored, transported, and applied in agricultural operations. Urea is 46% nitrogen.

---

[4] "Fall and Spring Anhydrous Ammonia Applications," *Bayer Crop Science* (April 15, 2024), *available at* https://www.cropscience.bayer.us/articles/bayer/fall-spring-anhydrous-ammonia-applications

**Figure 5.  Urea.[5]**



42.     Nitrogen Fertilizers may also be produced by reacting ammonia with nitric acid to form ammonium nitrate. Ammonium nitrate fertilizer is 34% or 34.5% nitrogen. Urea and ammonium nitrate may be blended together to produce urea-ammonium nitrate, or UAN. UAN is a liquid solution containing 28-32% nitrogen and is one of the most popular Nitrogen Fertilizers.

43.     Nitrogen Fertilizer production is highly concentrated. CF Industries, Nutrien, Koch, and Yara control more than 80% of Nitrogen Fertilizer production in North America during the Class Period. This extreme concentration is the product of decades of consolidation in the NPK Fertilizer industry.

---

[5] "Urea Fertilizer," *Cornell University Cooperative Extension*, *available at http*://nmsp.cals.cornell.edu/publications/factsheets/factsheet80.pdf

## 2. Phosphorus Fertilizer Production

44.     Phosphorus Fertilizer is produced from phosphate rock. Phosphate rock is mined from deposits that formed millions of years ago when organic material accumulated in ancient seabeds.

45.     The United States has some 1 billion metric tons of phosphate rock in reserves. Most of the United States' phosphate rock deposits are in Florida and North Carolina.

**Figure 6. Mosaic Phosphate Mine in Florida.[6]**



46.     After the phosphate rock is extracted, Phosphorus Fertilizers are produced by treating the phosphate rock with an acid (often sulfuric acid) to produce phosphoric

---

[6] Carter Weinhofer, "Manatee County officials extend Mosaic's controversial phosphate mining permit," *Bradenton Herald* (Feb. 24, 2026), *available at* https://www.bradenton.com/news/local/article314750398.html

acid. The phosphoric acid is either concentrated or mixed with ammonia to make a range of Phosphate Fertilizers.

47.     Phosphate rock mining requires enormous capital investment, specialized engineering, extensive permitting, and years of development before production can begin.

48.     Phosphorus Fertilizer production is highly concentrated. Defendants Nutrien and Mosaic accounted for more than 90% of Phosphorus Fertilizer production in North America during the Class Period. This extreme concentration is the product of decades of consolidation in the NPK Fertilizer industry.

### 3.  Potash Production

49.     Potash is mined from underground deposits. Most of the Potash purchased in the United States is imported from mines in Western Canada. Non-Defendant Intrepid Potash, based in Denver, Colorado, is the sole domestic producer of Potash and only supplies approximately 3.5% of the U.S.'s total potassium consumption.

50.     Most commercial Potash is produced in the form of potassium chloride, also known as muriate of potash. Potassium chloride deposits were formed millions of years ago when ancient lakes evaporated and left behind concentrated layers of potassium salts.

51.     Potash may be extracted through conventional underground mining or through solution mining.

52.    In conventional underground mining, shafts are drilled thousands of feet below the surface to access potash ore bodies. Mining equipment removes the ores, which are then transported to mills for processing into Potash fertilizer products.

**Figure 7. Inside a Nutrien Potash Mine.[7]**



53.    In solution mining operations, water is injected into underground potash deposits to dissolve potassium salts. The resulting brine solution is then pumped to the surface to cool, where the potassium salts are recovered and then transported to mills for processing into Potash fertilizer products.

---

[7] Guy Quenneville, "Ever wondered what it's like underground at a Sask. potash mine? Here's a look down under," *CBC* News (Aug. 13, 2019), *available at* https://www.cbc.ca/news/canada/saskatoon/ever-wondered-what-it-s-like-underground-at-a-sask-potash-mine-here-s-a-look-down-under-1.5245932

**Figure 8. Mosaic's Belle Plaine, the Largest Solution Mine in the World.[8]**



54.     Potash mining requires enormous capital investment, specialized engineering, extensive permitting, and years of development before production can begin.

55.     Potash production is highly concentrated. Defendants Nutrien and Mosaic account for more than 90% of potash production in North America during the Class Period. This extreme concentration is the product of decades of consolidation in the NPK Fertilizer industry.

### a.  Canpotex's Role in the Potash Market

56.     Canpotex is a Canadian potash export and marketing company jointly owned by Defendants Nutrien and Mosaic. Canpotex coordinates the offshore marketing, sales, and transportation of Potash produced by Nutrien and Mosaic.

---

[8] "Belle Plaine," *Mosaic*, *available at https*://mosaicincanada.com/mosaic-in-canada/Belle-Plaine

57.     Canpotex was formed in 1972 as a joint export association for Canadian Potash producers. Through Canpotex, its owners collectively market and distribute Potash produced from their Canadian mines to customers outside of North America. Canpotex's five largest markets (Brazil, China, India, Indonesia, and Malaysia) account for approximately 75% of Canpotex's annual Potash exports.

58.     Canpotex operates an integrated export system that includes a fleet of specialized railcars, port terminal facilities, and dedicated ocean vessels used to transport Potash overseas. This infrastructure allows Canpotex's members to export Potash from Saskatchewan mines to overseas customers through a centralized transportation network.

59.     By selling Potash through a single export marketing organization, Canpotex provides its owners, Defendants Nutrien and Mosaic, with a mechanism for coordinating key aspects of Potash sales, including export volumes and shipment schedules. Upon information and belief, Canpotex collects and manages competitively sensitive information concerning Potash production, inventories, customer demand, pricing conditions, and shipment logistics.

60.     While Canpotex is not used to export Potash into the United States, the use of Canpotex as a joint exporting and marketing organization, generally, creates opportunities for would-be competitors, Defendants Nutrien and Mosaic, to exchange competitively sensitive information and align their pricing and supply strategies in the United States.

### B. Anticompetitive Conduct

61.     Beginning in or around 2021, NPK Fertilizer prices departed from historical norms and began increasing at unprecedented rates. NPK Fertilizer prices spiked dramatically throughout 2021 and 2022 and remained elevated well after the supply shocks Defendants claimed were responsible subsided. The inflated prices are a result of Defendants' conspiracies.

#### 1.  Defendants' Conspiracies to Increase Prices of Fertilizer

62.     Upon information and belief, Defendants' conspiracies were implemented through coordinated output restraint and capacity discipline. Defendants in each market collectively restricted the supply of NPK Fertilizers sold into the United States by, among other things: (1) curtailing production and idling available capacity; (2) delaying or limiting production expansions despite record-high prices; (3) managing inventory in a manner that maintained artificial scarcity; and (4) ensuring that no Defendant meaningfully expanded output in response to price increases.

63.     In a competitive market, record-high prices would have triggered a rapid and sustained supply response. That did not occur here. Instead, Defendants maintained "capacity discipline" and ensured that supply in each market remained tight even as prices rose to historic highs.

64.     This "managed scarcity" was not an accident. Instead, upon information and belief, Defendants in each market agreed to reduce supply.

65.     Moreover, the market structure made such a scheme feasible. With only a handful of dominant producers controlling nearly all North American NPK Fertilizer

production, Defendants did not need to coordinate with dozens of firms. They only needed to coordinate with each other in their respective markets.

66.    Defendants' ability to restrict supply in each market was further strengthened by high entry barriers and the long lead times required to establish new production facilities or mines. These barriers prevented competitive supply responses that would otherwise have disciplined Defendants' pricing.

67.    As a result, Defendants were able to sustain record-high NPK Fertilizer prices for an extended period, forcing farmers and other direct purchasers to pay supracompetitive prices.

### 2.  Prices of NPK Fertilizers Moved in Tandem

68.    Across NPK Fertilizers, publicly available pricing disclosures show a strong parallel pattern: a sharp increase in 2021 to 2022, price decreases in 2023, and renewed increases beginning in 2024 and continuing through the present.

69.    During the 2021-2022 spike, the prices U.S. farmers paid for fertilizers increased by over 60% across the board. These increases added an estimated $128,000 in costs per farm for feed grain operations in 2022.

70.    The Producer Price Indices provided below show this pricing trend across NPK Fertilizers.

**Figure 9. Producer Price Index for Fertilizers (Last 10 Years)**



**Figure 10. Producer Price Index for Nitrogen Fertilizers (Last 10 Years)**



**Figure 11. Producer Price Index for Phosphorus Fertilizers (Last 10 Years)**



**Figure 12. Producer Price Index for Potash (data after 2022 unavailable)**



71. While farmers like Plaintiff and members of the Class paid higher prices for NPK Fertilizers, Defendants experienced record high profits, as shown in Figure 13 below.

**Figure 13. Defendants' Profits Spike Following Price Increases[9]**



---

[9] Noah Zahn, "The price of plenty: Fertilizer companies cash in while farmers struggle," *WUSF NPR* (June 8, 2023), *available at* https://www.wusf.org/environment/2023-06-08/the-price-of-plenty-fertilizer-companies-cash-in-farmers-struggle

### a. Parallel Nitrogen Fertilizers Price Increases

72.     Public financial disclosures by Nutrien and CF Industries show that Nitrogen Fertilizer prices moved sharply upward beginning in 2021.

73.     In a release about its Q4 and 2022 earnings, Nutrien reported on February 15, 2023, that its average, year-over-year, prices for Nitrogen Fertilizers increased across all forms. Specifically, it reported that ammonia prices increased from approximately $477 per metric ton (1,000 kg) in 2021 to approximately $973 per metric ton in 2022, a 104% increase; urea prices increased from approximately $478 per metric ton to approximately $696 per metric ton, a 46% increase; and prices for nitrates and other Nitrogen Fertilizers increased from $238 per metric ton to approximately $402 per metric ton, a 69% increase.

74.     A few days later, on February 23, 2023, CF Industries revealed similar year-over-year price increases for its Nitrogen Fertilizers in its 2022 Annual Report. Specifically, it reported that ammonia prices increased from approximately $452 per metric ton in 2021 to approximately $849 per metric ton in 2022, an 88% increase; urea prices increased from approximately $397 per metric ton to approximately $574 per metric ton, a 45% increase; prices for UAN solution increased from $247 per metric ton to approximately $477 per metric ton, a 93% increase; and prices for ammonium nitrate increased from $269 per metric ton to approximately $480 per metric ton, a 78% increase.

75.     Upon information and belief, Defendants Yara and Koch made similar price increases across their lines of Nitrogen Fertilizers.

### b. Parallel Phosphorus Fertilizers Price Increases

76.    Public financial disclosures by Nutrien and Mosaic show that Phosphorus Fertilizer prices moved sharply upward beginning in 2021.

77.    In a release about its Q4 and 2022 earnings, Nutrien reported on February 15, 2023, that its average, year-over-year, price for Phosphorus Fertilizers in North America increased from approximately $602 per metric ton in 2021 to approximately $806 per metric ton in 2022, a 34% increase.

78.    On February 22, 2023, Mosaic made a similar announcement.  In a release about its Q4 and 2022 earnings, Mosaic reported that its average price for Phosphorus Fertilizers in North America increased from approximately $564 per metric ton in 2021 to approximately $804 per metric ton in 2022, a 43% increase.

79.    While Defendants' Phosphorus Fertilizer prices began declining in 2023, the price decreases did not last. In 2025, Defendants Nutrien and Mosaic once again raised prices to similar levels.

80.    In a release about its Q4 and 2025 earnings, Nutrien reported on February 18, 2026, that its price for Phosphorus Fertilizer in North America increased from approximately $615 per metric ton in Q4 2024 to approximately $677 per metric ton in Q4 2025, a 10% increase. Similarly, Mosaic reported on February 24, 2026, that its price for Phosphorus Fertilizer in North America increased from approximately $593 per metric ton in Q4 2024 to approximately $686 per metric ton in Q4 2025, a 16% increase.

### c.  Parallel Potash Price Increases

81.     Public financial disclosures by Nutrien and Mosaic show that Potash prices moved sharply upward beginning in 2021.

82.     In a release about its Q4 and 2022 earnings, Nutrien reported on February 15, 2023, that its average, year-over-year, price for Potash in North America increased from approximately $317 per metric ton in 2021 to approximately $667 per metric ton in 2022, a 110% increase.

83.     On February 22, 2023, Mosaic made a similar announcement. In a release about its Q4 and 2022 earnings, Mosaic reported that its average price for Potash in North America increased from approximately $285 per metric ton in 2021 to approximately $632 per metric ton in 2022, a 122% increase.[10]

84.     While Defendants' Potash prices began declining in 2023, the price decreases did not last. In 2025, Defendants Nutrien and Mosaic once again raised prices to similar levels.

85.     In a release about its Q4 and 2025 earnings, Nutrien reported on February 18, 2026, that its price for Potash in North America increased from approximately $270 per metric ton in Q4 2024 to approximately $305 per metric ton in Q4 2025, a 13% increase. Similarly, Mosaic reported on February 24, 2026, that its price for Potash in

---

[10] "The Mosaic Company Reports Fourth Quarter and Full Year 2022 Results," Mosaic (Feb. 22, 2023), *available at* https://s1.q4cdn.com/823038994/files/doc_financials/2022/q4/FINAL_Press-Release-Q4-2022-_305PM.pdf

North America increased from approximately $199 per metric ton in Q4 2024 to approximately $264 per metric ton in Q4 2025, a 33% increase.

### 3. Input Price Increases do not Explain NPK Fertilizers Price Increases

86.     Defendants have repeatedly attributed NPK Fertilizers price increases during the Class Period to general inflation, logistics disruptions, and global supply events, including but not limited to, the war in Ukraine and the resulting sanctions on exports from Russia and Belarus.

87.     However, international supply disruptions do not fully explain the persistently high prices. For Phosphate Fertilizers, for instance, only 2% of fertilizer needs were met through imports in 2022.

88.     Regarding Potash, following the 2022 invasion of Ukraine, producers of Potash outside of sanctioned countries would have been incentivized to increase supply levels in order to take share from their competitors. Absent any other restriction on the supply of Potash, a continued expansion of supply should have resulted in prices falling back to pre-2022 levels. However, prices have continued to stay at supracompetitive levels, well above those set out in 2021, throughout this period. Potash producers' refusal to cut their prices constitutes an action which would, absent a conspiracy to increase or stabilize prices, be against their economic self-interest.

89.     Moreover, in December of 2025, the United States agreed to remove sanctions on Belarusian Potash, a major source of supply, in exchange for the release of political prisoners. However, the reaction in prices of Potash was "muted," with this reopened supply source failing to bring down prices.

90.     Nor do input price increases explain the continually high price of Nitrogen Fertilizer. Prices remained elevated throughout the Class Period even when natural gas prices were relatively cheap.

91.     Indeed, prices across all three fertilizer sources "remain[ed] stubbornly high" throughout the Class Period, "even as commodity markets soften[ed]."[11]

92.     On December 8, 2021, the Family Farm Action Alliance sent a letter to the United States Department of Justice, "calling for an investigation into the highly-consolidated fertilizer sector on the suspicion of anti-competitive practices." The letter called out Defendants' unsupported claims of supply issues:

> Claiming a global shortage, fertilizer companies have recently broken records with the ballooning prices they charge for fertilizer. Yet the companies' own documents refute any shortage claims and reveal they have additional capacity they're not utilizing. While it's true that natural gas prices are currently high, Yara's 2021 third quarter report states explicitly that this has had "[l]imited impact on finished fertilizer production to date; Yara is closely monitoring the situation going forward."  Nutrien's annual report states that "due to historically low global ammonia prices we curtailed production...while maintaining flexibility to respond to improvements in the market condition."  Their potash capacity likewise exceeds current production levels, and in 2020 the cash cost to produce potash was $59 per tonne, the lowest level on record for Nutrien.[12]

---

[11] RealAgriculture Market Team, "Sticky input prices and short supplies: What's keeping fertilizer costs high?," *realagriculture* (Aug. 28, 2025), *available at* https://www.realagriculture.com/2025/08/sticky-input-prices-and-short-supplies-whats-keeping-fertilizer-costs-high/

[12] Letter to DOJ from Joe Maxwell, President of Family Farm Action Alliance (December 8, 2021).

### 4. U.S.D.A. Allegations of Collusion

93.     In January 2026, U.S. Department of Agriculture Deputy Secretary

Stephen Vaden publicly stated that Defendants Mosaic and Nutrien had been

"constraining supply and driving up the price that farmers pay" for fertilizers. He said,

"It's unacceptable. . . we're not going to allow these two companies to do anything to

undermine . . . any other new market participant that wants to come in, provide new

fertilizer supply and break up the cute little game that Mosaic and Nutrien have been

playing for the last several years."[13]

### 5. DOJ Investigating NPK Fertilizer Producers for Antitrust Violations

94.     On March 4, 2026, *Bloomberg Law* reported that the United States

Department of Justice, Antitrust Division, was investigating whether producers of NPK

Fertilizers colluded to raise prices.

95.     According to the reporting, "[t]he companies whose conduct is under

scrutiny include phosphate and potash suppliers Nutrien Ltd. and Mosaic Co., as well as

CF Industries Holdings Inc., Koch Inc. and Norway's Yara International ASA . . . . CF

Industries, Koch, Yara and Nutrien control most of the nitrogen-based fertilizer sold in

the US."[14]

---

[13] "A Conversation with USDA Deputy Secretary Stephen Vaden," The National
Agricultural Center (Jan. 21, 2026), *available at*
https://nationalaglawcenter.org/webinars/vaden/

[14] Josh Sisco, "DOJ Probes US Fertilizer Market for Possible Price Fixing," *Bloomberg
Law* (March 4, 2026), *available at*
https://www.bloomberglaw.com/bloomberglawnews/antitrust/BNA%200000019cba7ed3
6fa5bcbefe83ad0000?bna_news_filter=antitrust

96.     *Bloomberg Law* indicated that DOJ was probing these companies for possible civil and criminal antitrust violations.

### 6. Fertilizer Industry Has Been Scrutinized in the Past

97.     The fertilizer industry, including Defendants, have previously been targeted by private litigants and government enforcers for anticompetitive and unfair business practices.

98.     In the early 1990s, several Potash producers were the subject of a price-fixing investigation by the Antitrust Division of the United States Department of Justice.

99.     On September 15, 2008, a class action was filed on behalf of purchasers of Potash, alleging that various worldwide producers of Potash jointly restricted output in order to impose price increases. See *In re Potash Antitrust Litig.*, 667 F. Supp. 2d 907, 916, 919 (N.D. Ill. 2009). Plaintiffs' claims survived a motion to dismiss, which the Seventh Circuit affirmed. *Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845, 860 (7th Cir. 2012).

100.    Following this decision, the Potash producers settled. On February 10, 2013, both Mosaic and PotashCorp. announced that they individually agreed to pay $43.75 million to settle the claims. Agrium, Inc. agreed to pay an additional $10 million, for a total settlement value of almost $100 million.

101.    The end of this litigation was not the end of scrutiny of anticompetitive conduct in the Potash industry. In fall 2013, the American Antitrust Institute released a monograph which described a qualitative and quantitative analysis of the exercise of market power by "the few, large global producers of fertilizer inputs." The report noted

that fertilizer inputs were "conducive to anticompetitive coordination (i.e. collusion)" and concluded that "fertilizer producers have likely acted in a coordinated fashion to raise prices, to the detriment of competitors and consumers." The monograph also discussed how, through Canpotex, producers engage in anticompetitive sharing of information on export prices and volumes.[15]

### 7. "Plus Factors" in the Fertilizer Industry Provide Additional Evidence of a Conspiracy

102.     Prominent legal and economic antitrust scholars studying collusive behavior have identified certain "plus factors," which are "economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action," and therefore support an inference of collusion.[16] Each plus factor that is present constitutes a piece of circumstantial evidence supporting active collusion, as opposed to mere conscious parallelism. The factors that provide the most probative value and lead to a strong inference of explicit collusion are referred to as "super plus factors."[17]

103.     Here, several plus and super plus factors support the plausible inference that Defendants are members of a *per se* unlawful price fixing cartel. These include: (1) Defendants' exchange of competitively sensitive information; (2) an increasingly

---

[15] C. Robert Taylor and Diana L. Moss, "The Fertilizer Oligopoly: The Case For Global Antitrust Enforcement," *The American Antitrust Institute* (Sept. 2013).

[16] William E. Kovacic, *Plus Factors and Agreement in Antitrust Law*, 110 Mich. L. Rev. 393, 393 (2011).

[17] *See id.* at 396-97.

concentrated market; (3) high barriers to entry; (4) opportunities and invitations to collude; and (5) a commodity product.

104.   ***First***, the reciprocal sharing of firm-specific competitively sensitive information that would normally remain private is a "super plus factor" that leads to a strong inference of active collusion. As described above, Defendants Mosaic and Nutrien are members of Canpotex, a Canadian export marketing agency through which Defendants collectively sell their Canadian Potash into overseas markets. Canpotex allows Defendants to share a range of competitively sensitive data, including production data, pricing information, and sales volumes. The data Canpotex collects is data which would normally be kept confidential given its competitively sensitive nature. Moreover, Defendants' employees display significant overlaps with that of Canpotex. Nutrien's CEO was formerly the President and CEO of Canpotex, for instance.

105.   ***Second***, the NPK Fertilizer markets are highly concentrated. As discussed above, just two firms dominate North American production for Potash and Phosphorus Fertilizers. Four firms dominate North American Production for Nitrogen Fertilizers. Moreover, foreign sources of NPK Fertilizers, particularly Potash, are increasingly less competitive following the war in Ukraine and subsequent tariff actions taken by the United States. The Nitrogen Fertilizer industry has seen continued consolidation dating back to 2008. In 2010, CF Industries acquired Terra, then one of the largest Nitrogen Fertilizer producers in North America. Similarly, the 2018 merger between Agrium and PotashCorp, which became Nutrien, created the second largest global producer of Nitrogen Fertilizer.

106.    A 2024 Texas A&M University study titled "Concentration and Competition in the U.S. Fertilizer Industry" noted that the Herfindahl-Hirschman Index (HHI) measure for Potash in the United States was at 3,455, Nitrogen Fertilizer was at 2,382, and Phosphate Fertilizer was at 4,553. DOJ and FTC consider markets in which the HHI is in excess of 1,800 points to be highly concentrated.

107.    Farmers have recognized that consolidation has led to higher prices. For instance, a farmer in North Dakota recently noted that "[f]ertilizer's up over a year ago, but I think a big part of that is driven by too few players . . . . when you have monopolies control fertilizer, that's what happens."[18]

108.    **Third**, NPK Fertilizer producers face significant entry barriers including financial, regulatory, operational, and logistical costs. Potential new entrants face a variety of capital costs, including land acquisition and the construction of facilities able to produce NPK Fertilizers. Potential new entrants would also need to displace long-standing customer relationships. Thus, new entrants into each of the markets are unlikely to discipline cartel pricing.

109.    **Fourth,** there are large and powerful trade associations and events in the NPK Fertilizers industry which provide Defendants with opportunities to collude. The Fertilizer Institute, the leading U.S. trade association for the U.S. fertilizer industry, hosts an Annual Business Conference which is "the premier networking event for the fertilizer

---

[18] Michelle Rook, "DOJ Begins Probe of Fertilizer Producers for Collusion: Is it Warranted?," *AG WEB* (Mar. 9, 2026), *available at* https://www.agweb.com/news/doj-begins-probe-fertilizer-producers-collusion-it-warranted

industry." As of 2026, Nutrien's CEO Kenneth Seitz, Mosaic's President Bruce Bodine, CF Industries' COO Christopher Bohn, Koch E.V.P. Scott McGinn, and Yara's President Sabine Schröder, all sit on the Fertilizer Institute's Board of Directors. All Defendants are members of the International Fertilizer Association ("IFA"). IFA holds multiple annual events, including a conference and a Strategic Forum. IFA also maintains IFASTAT, which provides Defendants with competitively sensitive information in the form of comprehensive stats on fertilizer supply and consumption. Additionally, Kenneth Seitz is a member of the Executive Committee for the IFA.

110.    *Fifth*, Nitrogen Fertilizers, Phosphorus Fertilizers, and Potash are fungible, homogenous commodity products with little differentiation, and one supplier's type is readily substituted for another supplier. As a result, buyers make purchase decisions based largely, if not entirely, on price.

## V.  ANTICOMPETITIVE EFFECTS AND RELEVANT ANTITRUST MARKETS

111.    Defendants' anticompetitive conduct had the following effects, among others:

    a.  Competition among the Defendants has been restrained or eliminated with respect to NPK Fertilizer prices;

    b.  The price of NPK Fertilizers has been fixed, stabilized, or maintained at artificially high levels; and

    c.  Individuals have been deprived of free and open competition.

112.    Defendants' violations of the antitrust laws have caused Plaintiff and members of the Class to pay higher prices for NPK Fertilizers than they would have in

the absence of Defendants' conspiracies, and, as a result, Plaintiff and members of the Class have suffered damages in the form of overcharges paid on their NPK Fertilizers purchases. This is an injury of the type that the antitrust laws were meant to punish and prevent. Defendants' price fixing agreements are *per se* unlawful, or, alternatively, are unlawful under either a quick look or rule of reason analysis.

113.    Under the *per se* standard, and additionally where, as here, there are demonstrable anticompetitive effects, a relevant product and geographic market need not be defined. However, Plaintiff defines such markets below in case their allegations are ultimately analyzed under a quick look or rule of reason analysis.

### A. The Relevant Product Market Is NPK Fertilizers

114.    To the extent a relevant product market needs to be defined in this action, it is the market for NPK Fertilizers. Additionally, or in the alternative, individual submarkets exist for Nitrogen Fertilizers, Phosphorus Fertilizers, and Potash.

### B. The Relevant Geographic Market Is National

115.    Should a geographic market need to be defined in this action, it is the United States. Defendants produce and distribute NPK Fertilizers through locations across the United States and have increased NPK Fertilizer prices nationwide.

### VI.   STATUTE OF LIMITATIONS AND TOLLING

116.    Plaintiff and members of the Class had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiff and Class Members did not discover and could not have discovered through the exercise of reasonable

diligence, the existence of the conspiracy alleged herein until shortly before filing this action.

117.   Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed their anticompetitive agreement from Plaintiff and members of the Class.

118.   Plaintiff and members of the Class had no knowledge of the unlawful conduct alleged in this Complaint until early 2026, when U.S.D.A. made allegations that Defendants were engaging in anticompetitive conduct and DOJ's antitrust investigation was publicly revealed.

119.   Due to Defendants' fraudulent concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiff or members of the Class has been tolled during the period of such fraudulent concealment.

## VII.   CLASS ALLEGATIONS

120.   Plaintiff brings this action individually and on behalf of all others similarly situated as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3), seeking damages, as well as equitable and injunctive relief, on behalf of the following Class:

> All persons and entities who purchased NPK Fertilizers directly from one or more Defendants, or from any division, subsidiary, predecessor, agent, or affiliate of such Defendants, at any time during the period of January 1, 2021 ("Class Period") until Defendants' unlawful conduct and its anticompetitive effects cease to persist.

121.   The following persons and entities are excluded from the above-described proposed Class:

    a.  Defendants and their counsel, officers, directors, management, employees, subsidiaries, or affiliates;

    b.  All governmental entities;

    c.  All Counsel of Record; and

    d.  The Court, Court personnel, and any member of their immediate families.

122.    The Class is so numerous as to make joinder impracticable. Plaintiff does not know the exact number of Class members because such information is presently in the exclusive control of Defendants. Plaintiff believes that due to the nature of the industry there are likely, at a minimum, thousands of Class members in the United States and its territories.

123.    Common questions of law and fact exist as to all members of the Class. Plaintiff and the Class were injured by the same unlawful scheme, Defendants' anticompetitive conduct was generally applicable to all members of the Class, and relief to the Class as a whole is appropriate. Common issues of fact and law include, but are not limited to, the following:

    a.  Whether the Nitrogen Defendants and their Unnamed Co-conspirators engaged in a combination or conspiracy to fix, raise, maintain, or stabilize prices for Nitrogen Fertilizers;

    b.  Whether the Phosphorus Defendants and their Unnamed Co-conspirators engaged in a combination or conspiracy to fix, raise, maintain, or stabilize prices for Phosphorus Fertilizers;

c.   Whether the Potash Defendants and their Unnamed Co-conspirators engaged in a combination or conspiracy to fix, raise, maintain, or stabilize prices for Potash;

d.   The duration of the conspiracies alleged herein and the acts performed by Defendants and their Unnamed Co-conspirators in furtherance of the conspiracies;

e.   Whether such conspiracies violated the federal antitrust laws;

f.   Whether the conduct of Defendants and their Unnamed Co-conspirators, as alleged in this Complaint, caused injury to Plaintiff and other members of the Class;

g.   Whether Defendants caused Plaintiff and the Class to suffer damages in the form of overcharges on NPK Fertilizers;

h.   The appropriate class-wide measure of damages; and

i.   The nature of appropriate injunctive relief to restore competition in the markets for NPK Fertilizers.

124.   Plaintiff's claims are typical of the claims of Class members, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff and all members of the Class are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated prices for NPK Fertilizers.

125.   Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiff's interests are coincident with and typical of, and not antagonistic to, those of the other members of the Class.

126.    Plaintiff has retained counsel with substantial experience litigating complex antitrust class actions in myriad industries and courts throughout the nation.

127.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including issues relating to liability and damages.

128.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Moreover, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

129.    Plaintiff knows of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

## VIII.  CAUSES OF ACTION

### COUNT 1

**Price Fixing of Nitrogen Fertilizers in Violation of
Section 1 of the Sherman Act (15 U.S.C. § 1)
(against the Nitrogen Defendants)**

130.    Plaintiff repeats the allegations set forth above, as if fully set forth herein.

131.    Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2021 (further investigation and discovery may reveal an earlier date), and continuing through the present, Defendants CF Industries, Nutrien, Koch, and Yara and their co-conspirators entered into and engaged in a contract, combination, or conspiracy to unreasonably restrain trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

132.    The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, stabilize, or maintain at artificially high levels the price of Nitrogen Fertilizer causing anticompetitive effects without sufficient procompetitive justifications.

133.    Plaintiff and members of the Class have been injured and will continue to be injured in the form of overcharges on Nitrogen Fertilizers.

134.    Defendants' anticompetitive conduct had the following effects, among others:

    a.  Competition among Defendants has been restrained or eliminated with respect to Nitrogen Fertilizer prices;

b.   The prices of Nitrogen Fertilizer have been fixed, stabilized, or maintained at artificially high levels; and

c.   Plaintiff and members of the Class have been deprived of the benefits of free and open competition between and among Defendants.

135.   This conduct is unlawful under the *per se* standard. Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the agreement is anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through less restrictive means of competition.

136.   Plaintiff and members of the Class are entitled to treble damages, attorneys' fees and costs, and an injunction against Defendants to end the ongoing violations alleged herein.

## COUNT 2

### Price Fixing of Phosphorus Fertilizers in Violation of Section 1 of the Sherman Act (15 U.S.C. § 1) (against the Phosphorus Defendants)

137.   Plaintiff repeats the allegations set forth above, as if fully set forth herein.

138.   Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2021 (further investigation and discovery may reveal an earlier date), and continuing through the present, Defendants Nutrien, Mosaic and their co-conspirators entered into and engaged in a contract, combination, or conspiracy to unreasonably restrain trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

139.    The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, stabilize, or maintain at artificially high levels the price of Phosphorus Fertilizers causing anticompetitive effects without sufficient procompetitive justifications.

140.    Plaintiff and members of the Class have been injured and will continue to be injured in the form of overcharges on Phosphorus Fertilizers.

141.    Defendants' anticompetitive conduct had the following effects, among others:

a.  Competition among Defendants has been restrained or eliminated with respect to Phosphorus Fertilizer prices;

b.  The prices of Phosphorus Fertilizers have been fixed, stabilized, or maintained at artificially high levels; and

c.  Plaintiff and members of the Class have been deprived of the benefits of free and open competition between and among Defendants.

142.    This conduct is unlawful under the *per se* standard. Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the agreement is anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through less restrictive means of competition.

143.    Plaintiff and members of the Class are entitled to treble damages, attorneys' fees and costs, and an injunction against Defendants to end the ongoing violations alleged herein.

## COUNT 3

**Price Fixing of Potash in Violation of
Section 1 of the Sherman Act (15 U.S.C. § 1)
(against the Potash Defendants)**

144.    Plaintiff repeats the allegations set forth above, as if fully set forth herein.

145.    Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2021 (further investigation and discovery may reveal an earlier date), and continuing through the present, Defendants Nutrien, Mosaic, Canpotex and their co-conspirators entered into and engaged in a contract, combination, or conspiracy to unreasonably restrain trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

146.    The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, stabilize, or maintain at artificially high levels the price of Potash causing anticompetitive effects without sufficient procompetitive justifications.

147.    Plaintiff and members of the Class have been injured and will continue to be injured in the form of overcharges on Potash.

148.    Defendants' anticompetitive conduct had the following effects, among others:

> a.  Competition among Defendants has been restrained or eliminated with respect to Potash prices;

    b.  The prices of Potash have been fixed, stabilized, or maintained at artificially high levels; and

    c.  Plaintiff and members of the Class have been deprived of the benefits of free and open competition between and among Defendants.

149.   This conduct is unlawful under the *per se* standard. Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the agreement is anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through less restrictive means of competition.

150.   Plaintiff and members of the Class are entitled to treble damages, attorneys' fees and costs, and an injunction against Defendants to end the ongoing violations alleged herein.

## COUNT 4

### Unjust Enrichment

151.   Plaintiff repeats the allegations set forth above, as if fully set forth herein.

152.   Alternatively, from the acts of Defendants as alleged above, Defendants have been unjustly enriched at the expense of Plaintiff and members of the Class.

153.   Defendants have artificially increased the price of NPK Fertilizers paid by Plaintiff and members of the Class.

154.   Defendants reaped from Plaintiff and members of the Class artificially high profits for NPK Fertilizers.

155.    Defendants have been unjustly enriched by retaining the artificially high profits for NPK Fertilizers collected from Plaintiff and members of the Class.

156.    The retention of these profits by Defendants violates the fundamental principles of justice, equity, and good conscience and should be returned to Plaintiff and members of the Class.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class, respectfully asks this Court for the following:

A.  The Court determine that this action may be maintained as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and its counsel of record as Lead Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.  The Court adjudge and decree that the acts of Defendants are illegal and unlawful, including conspiracies, and acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have been a *per se* violation (or alternatively illegal under a quick look or rule of reason standard) of Section 1 of the Sherman Act (15 U.S.C. § 1);

C.  The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors,

agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conspiracies alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.  The Court grant Plaintiff and members of the Class all other equitable relief in the nature of disgorgement, restitution, and/or the creation of a constructive trust to remedy the Defendants' unjust enrichment;

E.  The Court enter judgment against Defendants, jointly and severally, and in favor of Plaintiff and members of the Class for treble the amount of damages sustained by Plaintiff and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law; and

F.  The Court award Plaintiff and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

**JURY TRIAL DEMANDED**

157.  Plaintiff and members of the Class demand a trial by jury on all claims so triable under Federal Rule of Civil Procedure 38(b).

Dated: March 13, 2026

Respectfully submitted,

*/s/ Jonathan S. Crevier*
Jonathan S. Crevier (CO Bar Number: 62506)
**DICELLO LEVITT LLP**
6645 South Cherry Way
Centennial, Colorado 80121
(646) 933-1000
jcrevier@dicellolevitt.com

Gregory S. Asciolla
Theodore Salem-Mackall
**DICELLO LEVITT LLP**
485 Lexington Avenue, Suite 1001
New York, New York 10017
(646) 933-1000
gasciolla@dicellolevitt.com
tsalemmackall@dicellolevitt.com

Adam J. Levitt
**DICELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
(312) 214-7900
alevitt@dicellolevitt.com

Eric Olson
**OLSON GRIMSLEY KAWANABE
HINCHCLIFF & MURRAY LLC**
700 17th Street, Suite 1600
Denver, CO 80202
Phone: (303) 535-9151
eolson@olsongrimsley.com

*Attorneys for Plaintiff and the Proposed Class*